**16 CV 5961**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHASE GULLATT
_____
_____
_____

*(In the space above enter the full name(s) of the plaintiff(s).)*

-against-

The City of New York
Warden Duffy, GMDC Rikers Island
Jane Sheviragh, Deputy Supt. GMDC
John Matos, Deputy Supt. GMDC
Captain John Doe, GMDC Intake
Officer John Doe, GMDC Intake
Officer Richard Roe GMDC Escort 2-Main
individually and in their official
capacities.

*(In the space above enter the full name(s) of the defendant(s). If you cannot fit the names of all of the defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed in the above caption must be identical to those contained in Part I. Addresses should not be included here.)*

**RECEIVED**
**SDNY PRO SE OFFICE**
**2016 JUL 26  AM 10: 00**

**COMPLAINT**
under the
Civil Rights Act, 42 U.S.C. § 1983
(Prisoner Complaint)

Jury Trial:  ☑ Yes   ☐ No
(check one)

**I.      Parties in this complaint:**

A.      List your name, identification number, and the name and address of your current place of confinement. Do the same for any additional plaintiffs named. Attach additional sheets of paper as necessary.

Plaintiff         Name  Chase Gullatt
                  ID # 15A1962 / NYSID No. 07567118K
                  Current Institution Five Points Correctional Facility
                  Address State Route 96, P.O. BOX 119
                  Romulus, N.Y. 14541

B.      List all defendants' names, positions, places of employment, and the address where each defendant may be served. Make sure that the defendant(s) listed below are identical to those contained in the above caption. Attach additional sheets of paper as necessary.

Defendant No. 1    Name _____ ( see attached )   Shield # _____
                   Where Currently Employed _____
                   Address _____
                   _____

*Rev. 05/2010*                                    1

B.                    I. Parties in this Complaint:

1. <u>Defendant No. 1:</u> City of New York is and was at all relevent times herein a Municipal Corporation of the State of New York

2. <u>Defendant No. 2:</u> Warden John Duffy was at all relevent times herein the Acting Warden of the Municipal prison/Jail George Motchan Detention Center (GMDC) at Rikers Island for the City of N.Y. As Warden of the Jail, Defendant Managed its day-to-day operations and executed its policies.

3. <u>Defendant No. 3:</u> Joseph Ponte is and was at all relevent times herein the Commissioner of New York City Department of Corrections (DOC) for the City of New York. As commissioner Defendant was responsible for operating and maintaining detention, penal, and Corrective institutions within the City of New York which includes Rikers Island.

4. <u>Defendant No. 4:</u> Deputy Jane Shevivagh, was at all relevent times herein the Deputy Superintendent of George Motchan Detention Center (GMDC) on Rikers Island. As the superintendent the Defendant was responsible for the day-to-day safety and security of the facility.

5. <u>Defendant No. 5:</u> Deputy John Matos was at all relevent times herein the Deputy Superintendent of the George Motchan Detention Center (GMDC) on Rikers Island. As the Superintendent of (GMDC) Defendant was responsible for the day-to-day operations and security of the facility

6. <u>Defendant No. 6:</u> Captain John Doe who was the supervising officer on duty at the intake area of the George Motchan Detention Center (GMDC) at approx. 7:00 p.m. on February 2, 2015. As the adminstrative officer —

in charge of the intake area. Defendant was responsible for the safety and security of all new admission, transfer, and court inmates in intake.

7. Defendant No. 7: Correction Officer John Doe who was assigned to the intake desk at George Motchan Detention Center (GMDC) at approx. 7:00 p.m. on February 2, 2015. As the officer on desk duty Defendant was responsible for the safety and security of the intake area, and daily operations.

8. Defendant No. 8: Correction Officer Richard Roe who was the 2-Main escort officer on duty at George Motchan Detention Center (GMDC) at approx. 7:00 p.m. on February 2, 2015. As the assign escort officer for the 2-Main housing area. Defendant was responsible safely escorting inmates too and from 2-Main.

All above Defendants can be served at the address below:

New York City Law Department
100 Church Street
New York, N.Y. 10007

## JURISDICTION AND VENUE

a). This action arises under and is brought pursuant to 42 USC. Section 1983 to remedy the deprivation, under color of State law, of rights guaranteed by the fourth, Eighth, and Fourteeth Amendments to the United States Constitution. This court has jurisdiction over this action pursuant to 28 USC. Sections 1331 and 1343

Defendant No. 2   Name _____(See attached)_____ Shield #_____
                  Where Currently Employed _____
                  Address _____
                  _____

Defendant No. 3   Name _____(See attached)_____ Shield #_____
                  Where Currently Employed _____
                  Address _____
                  _____

Defendant No. 4   Name _____(See attached)_____ Shield #_____
                  Where Currently Employed _____
                  Address _____
                  _____

Defendant No. 5   Name _____(See attached)_____ Shield #_____
                  Where Currently Employed _____
                  Address _____
                  _____

## II.   Statement of Claim:

State as briefly as possible the <u>facts</u> of your case.   Describe how each of the defendants named in the
caption of this complaint is involved in this action, along with the dates and locations of all relevant events.
You may wish to include further details such as the names of other persons involved in the events giving
rise to your claims.  Do not cite any cases or statutes.  If you intend to allege a number of related claims,
number and set forth each claim in a separate paragraph.  Attach additional sheets of paper as necessary.

A.   In what institution did the events giving rise to your claim(s) occur?
George Motchan Detention Center (GMDC) Rikers
Island, 15-15 Hazen St, East Elmhurst, N.Y. 11370
(Pretrial Detainee under BK&CS: 241-12-09533)

B.   Where in the institution did the events giving rise to your claim(s) occur?
GMDC's Intake area after returning from
Bronx Criminal Court (Bronx Hall of Justice)

C.   What date and approximate time did the events giving rise to your claim(s) occur?
At approx. 7:00 P.M. on February 2, 2015

Plaintiff has filed no other lawsuit dealing with the
same facts involved in this action or otherwise
relating to his imprisonment.

D. II.                    Facts

9. On February 2, 2015 at approx. 7:00 p.m. plaintiff was returned back to George Motchan Detention Center (GMDC) at Rikers Island from Bronx Supreme Court.

10. Plaintiff was then placed into an over crowed holding cell in the intake area of GMDC to await an Officer escort.

11. While standing in the intake cell waiting for the Officer escort back to his Housing Unit 2-Main A-side the plaintiff witnessed three young inmates approach another inmate in the holding cell and asked him about his gang affiliation.

12. The inmate unknown to the plaintiff gave the three inmates some response which prompted one of them to call him a "hard back" which is the derogatory term used by bloods gang members to insult Crips.

13. The three inmates suddenly attacked the suspected Crip in a violent melee that attracted the attention of the intake officers, who could hear the commotion.

14. Defendant No. 7 Correction Officer John Doe rushed into the crowded intake cell and broke the brawl up

15. Defendant No. 7 then escorted the victom out of the cell while another officer held the door open for them to exit.

16. Defendant No. 7 Carelessly through inattention to his duty to protect, left all three assalents behind in the intake cell with the plaintiff and all the other Court return inmates, unrestrained and free to roam unhindered;

1 of 12

17. At that time plaintiff was standing on the left side of the intake cell facing the Officers desk. which was closed off by a door from another group of inmates who were already there when the Bronx Court bus arrived at GMDC.

18. An inmate unknown to plaintiff from that side of the intake cell yelled out "Yo hommies" to get the attention of the three assailants still in the cell, "Hommie" is the term Blood gang members use to address each other. while the Crips use "Cuz".

19. The inmate on the other side section of the intake cell got the three assailants attention and mistakenly told them out loud that the plaintiff was also a "Crip" because he over heard the plaintiff tell the officer when the Bronx bus came in. that he was from 2-Main and was in the cell awaiting an officer escort.

20. In GMDC, 2-Main is considered the "Crips House" because it is the administratively designated (SRG) or Security Risk Group, housing unit/ for Crip gang members

21. Two of the three assailants immediately approached the plaintiff agresively. but before the plaintiff could react or refute the allegation the plaintiff was overwhelmed by a flurry of wild blows to his face and head that lasted several seconds, in which plaintiff blocked as much as he can

22. Then just as fast as it started the two inmates suddenly stoped swinging and quickly started to dispurse cooly as if nothing had just happened.

23. When plaintiff lowered his gaurds from his face he quickly realized why the two inmates retreated so abruptly.

24. Defendant No. 7 Officer John Doe and Defendant No. 6

Captain John Doe who was the assigned supervising officer of the intake area at the time, where herded towards the intake cell.

25. Defendant No. 6 Captain John Doe ordered another officer to open the intake cell and told Defendant No. 7 Correction Officer John Doe to identify the attackers and take them to the back of the intake cell to a section that can be closed off to isolate them from the rest of the population inmates.

26. Defendant No. 7 Correction Office John Doe erroneously identified only two of the three assailants who attacked the other inmate who was taken out the cell while the third attacker blended into the crowd of inmates in the cell. but he was not involved in attacking the plaintiff.

27. Defendant No. 6 Intake captain went around the perimeter of the cell and herded to the back to speak to the two identified inmates.

28. Plaintiff tryed to get the attention of Defendant No. 7 correction Officer John Doe to tell him about what had just happened but defendant told the plaintiff that he was dealing with something else right now and went to the back of the cell to join the Captain.

29. Plaintiff's escort had just arrived and called the Plaintiff out the cell. by name

30. Plaintiff tryed to explain to Defendant No. 8 2-Main escort Officer Richard Roe about what just took place and requested to stay and speak to the Captain.

31. Defendant No. 8 acknowledge that he could tell from Plaintiff's face that something happened, but declared that he had to escort me back to 2-Main

3 of 12

as a matter of security, so I had to go immediatly.

32. Defendant No. 8 assured the plaintiff that the intake captain Defendant No. 6 was in the back with Defendant No. 7 Correction Officer John Doe and the separated inmates dealing with the situation, as he could see them all through the gate and gave the plaintiff confidence that he would make sure that he convey the information provided by plaintiff to the captain and that he would most likely be comming to the 2-Main housing unit to speak with me about the incident.

33. Defendant No. 8 escorted plaintiff back to the 2-Main housing unit and told the plaintiff that if he feels that he needs any medical attention to express those concerns with the 2-Main Station Officer so they can call the Clinic and arrange transport because 2-Main inmates can't mix with general population inmates in the facilities medical area, they have to wait in a separate waiting area when the space is available.

34. Defendant No. 8 droped the plaintiff off at 2-Main and left. plaintiff never heard anything from the intake captain or anyone else from the GMDC intake staff.

35. After arriving at 2-Main the plaintiff went into the bathroom to check his face in the mirror and notice that it started to develop redness and swelling.

36. Plaintiff informed the officer on duty about the injuries he sustained in an attack at the intake area and request to be seen by a medical staff to be treated for injuries.

37. The officer on duty gave the plaintiff a half hearted assurance that a call would be made to the facility

4 of 12

Clinic to request an escort to sick call.

38. No escort ever showed up to 2-Main for a clinic run and plaintiff doubts any call was ever made because the duty officer didn't appear to take plaintiff's injuries seriously because there was no blood. "I don't see any blood" was the response plaintiff got when he requested medical attention.

39. The assault and resulting injuries to plaintiff's face and head Occurred on 2/2/2015 at approx. 7:00 P.M. through no fault on the part of plaintiff, but wholly through the defendants negligence, carelessness, and diliberate indifference to the plaintiff's health, safety, and well being.

40. Through implementing, permitting, and condoning the policies and practice that allowed the plaintiff, a non-gang affiliated inmate to be placed in a gang infested (SRG) Crip housing unit that was a well known target of gang violence by rival gangs, and allowed the plaintiff to remain in this dangerus and hazzardus environment created by the defendants until the plaintiff was violently attacked by gang memebers rival to the Crips and hostile to anyone from GMDC 2-Main.

41. The "Crips" are a violent street gang, but as a whole, the Crips are grossly out numbered by rival gangs such as the "Bloods" and "Trinidadio's" inside the Department of Corrections and Rikers Island.

42. The Bloods and Trinidadio/Patriz gangs are the sworn enemies of the Crips and the Targe dis-proportion in numbers makes it much more dangerus to be a Crip or a preciued crip member then any other gang faction in the DOC.

5 of 12

43. This fact is recognized, accepted, and acknowledge by the DOC and is the principal underlying condition of all the security measures surrounding the Crips on Rikers Island

44. These security policies are designed to prevent wide spread gang violence and maintain the safety and security of the inmates and the facility.

45. For the Crips, these measure include Security Risk Group (SRG) segregated housing units, Correctional Officer escorts too and from the 2-Main housing unit, clearing the hall ways of all inmates not in 2-Main for commissary runs, separate and isolated Clinic and visit room waiting areas, and in-house feeding all devised for the specific purpose of preventing any face-to-face encounters with adversarial gang factions especially the Bloods and Trinidadio gangs.

46. Defendants No. 1 New York City, No. 3 Joseph Ponte No. 2 Warden John Duffy, No. 4 Deputy Supp. Jane Sheviragh, No. 5 Deputy Supp. John Matos were all personally responsable for inforcing, implementing, and condoning the policy and practice of housing non-gang affiliated inmates, called ("Neutral" inmates)[for not being engaged on either side of the gang wars going on in Rikers Island] In gang infested (SRG) housing units just to fill up bed spaces in those houses when there are more beds then gang members to fill them up, without regard to the safety of the neutral inmates.

47. All named defendants had a constitutional duty to protect the plaintiff from assault and protect his right to bodily integrity. Instead the defendants created a dangerous condition for the plaintiff by placing him in 2-Main, a (SRG) Crips house and known target of gang violence and subjecting the plaintiff to the same security measures and cautious restraints as a Crip gang member

48. The City of New York, its agent, servants, and all mentioned Defendants had actual, imputed, and constructive knowledge through the long and violent history between the Bloods and Crips on Rikers Island, the recent riots between the Crips and the Spanish gang Patria/Trinidadio that made the News and involved deadly weapons and resulted in numerous serious injuries to staff and inmates including one inmate lossing an eye, countless incidents involving cutting, stabbing, and group assaults, or just the every day experience of working at Rikers Island gives awareness of the fact that enmity of the most violent kind existed between the Bloods, Crips, and Patria/Trinidadio gang factions.

49. Defendants knew or should have known that placing the plaintiff in a known (SRG) Crips house would put the plaintiff at a substantial risk of serious harm in light of the chaotic gang atmosphere in CMDC and Rikers Island as a whole, and the frequency of gang assaults.

50. In light of the above facts its clear that any reasonable DOC employee would know that any face to face contact with members of the Bloods and Crips creates a recipe for violence, therefore no reasonable Correctional Official could possibly have thought that they were doing anything other then placing the plaintiff in danger by putting him in the "(Crips House)" to be escorted by Officers around the facility with known Crip members and giving the rival gang members sufficient reason to suspect that plaintiff must also be a Crip.

51. Defendants knowledge of the danger to plaintiff's safety is evident in the fact that the Defendants felt that it was necessary to protect the plaintiff with officer escorts whenever he had to leave 2-Main because the Defendants knew that plaintiff regardless of his neutral status faced

a substantial risk of serious harm if he left the 2-Main housing unit without officer protection due to his involuntary association to the Crips House.

52. Plaintiff has no ties nor allegiance to any street gang and nothing in DOC records gave GMDC administration reason to suspect otherwise. Plaintiff did not need any protection prior to being sent to 2-Main beyond what any other inmate in population would experience and no gang member affiliated with the Bloods or the Trinidadios had any predisposition, desire, nor any other reason to inflict harm upon the plaintiff before he was housed in 2-Main. Therefore the danger to plaintiff and the need for protection was only initiated after the plaintiff was transfered from (GMDC Dorm 12) to (GMDC 2-Main) which is a short walk distance from each other, and is evidence that Defendants created the danger and exposed the plaintiff to a substantial risk of harm, in light of the violent gang wars taking place all around Rikers Island and in GMDC and is the reason why the Bloods are housed separately from the Crips for obvious safety reasons.

53. Plaintiff and other neutral inmates housed in 2-Main realized the danger they faced outside of 2-Main because of other incidents of neutral 2-Main inmates being attacked by rival gang members who suspect them of being Crips after seeing them leave 2-Main. Plaintiff and other 2-Main neutral inmates came up with ways to minimize their exposure to danger by submitting proposals to GMDC's Inmate Council which includes Defendants No [2, 4, 5, and other GMDC officials] Plaintiff through 2-Main's house representative suggested to the inmate council that he be issued hallways passes so that he could move about the facility

like any other general population inmate, to school, sick cell, vists, and intake court runs.

54. This suggestion to issue passes to the neutral inmates was conceived with one goal in mind to reduce the chances that a neutral 2-main inmate will be misidentified by rival gang members as a member of the Crips which would subject him to the possibility of being attacked, or worse if they have weapons.

55. The issuing of the passes would have ended the officer escorts and the stigma attached to it and allow members of the general population to perceive the difference between neutral 2-main inmates and gang affiliated 2-main inmates, a distinction that means the difference between a curious glace in the hallway and a possible attack by Bloods or Trinidadio gang members.

56. Defendants Werden Duffy and deputy superintendent Sheviragh personally came to the 2-main housing unit to speak to the inmates about the pass situation.

57. Defendants Duffy and Sheviragh said that they discussed the proposal at relative length with other CMDC Officials in the inmate council and decided not to issue passes to the neutral 2-main inmates, formelly citing security concerns and informed all officers assigned to the 2-main housing unit not to issue any passes what so ever to any inmate housed in 2-main no matter what classiffication, or gang status they are, every 2-main inmate must have an officer escort whenever they leave 2-main including emergency sick call runs which is evidence that a serious danger existed for every inmate housed in 2-main.

58. The counsel rejected the idea of issueing the neutral inmates in 2-Main hallway passes citing safety concerns because the defendants knew that every inmate in 2-Main whether gang member or not faced a substantial risk of harm of the most violent kind if they left the 2-Main housing area without an Officer escort.

59. After analyzing the gravity of the situation the defendants put the plaintiff in, as far as the seriousness of the danger that awaits the Plaintiff out side of 2-Main the plaintiff declined to keep pressing for transfer to a general population house where all the Crips enemies dwell, even in 12 Dorm where plaintiff came from.

60. It became more safe to stay in 2-Main under high security then be confused with being a Crip then transfered to a Blood controled house where you will have no chance to explain yourself if they think you are a foe, and suspected Crip member.

61. Plaintiff is aware of a few incidents involving neutral 2-Main inmates requesting to be transfered to a general population house in GMDC and getting attacked after being accused of being a Crip, from 2-Main.

62. Plaintiff also witnessed while in 2-Main, Bloods gang members being mistakenly sent to 2-Main and getting attacked by the Crips housed there within seconds of walking in the house, thats all documented and recorded on the 2-Main's surveillance cameras.

63. The principle security measure binding upon (SRG) inmates is that they be isolated from the normal activities of general population inmates, especially when going to court.

64. The (SRG) Crip inmates housed in 2-Main are escorted

from 2-Main to the GMDC intake area and placed in a separate intake cells that only contain other members of the same gang. They are transfered to court in isolated cages built inside the court busses to avoid any physical contact with other court inmates. They are isolated in court cells that are seperated from the general population cells and when they return from court the process is reversed.

65. The neutral 2-Main inmates are not afforded the same level of protection as they travel too and from court. They are escorted to intake then security stops.

66. On February 2, 2015 the plaintiff was escorted with Crip/gang members to the intake area at GMDC but placed in a general population cell, while the Crips were placed in an isolated cell that was not overcrowded like the general population cell the plaintiff was held in.

67. This policy administered and supervised by the defendents was irrational and dangerous. If the inmate council which included defendents No. [2, 4, 5] determined based on the level of threats to the safety of 2-Main neutral inmates that it was logically necessary to continue officer escorts and deny the hallway passes to avoid any contact with the general population without officer security. Then why would they not make this protection available to the neutral inmates who they put in danger, during court runs like the other 2-Main inmates under (SRG) status

68. The defendents named in the inmate council had enforced a policy that created a danger to the plaintiffs' life and safety then declined to extend the security protection to court runs, even though the highest interaction with the general population is during court runs.

69. The acts and conduct of all named Defendants violated the Plaintiff's rights to be free from assault, adequate Medical care, be free from illegal body searches, and body integrity, protected by the fourth amendment to the United States Constitution, the eighth amendment's Cruel and unusal punishment, and the fourteenth amendment's due process clause. for the following reasons:

   a). Failing to reasonably protect the plaintiff from the constant threat of violence and assault

   b). Creating an unreasonable risk of harm in 2-main and GMDC intake area. that has a dangerous Potential for violence

   c). failing to provide adequate Medical care by forcing reliance of Medical emergencies on the discretion of untrained correctional staff with power to call or not call Medical escorts.

   D). for the indiscriminate placing of neutral inmates in SRG gang houses without adequate Classification in place to protect the safety and well-being of inmates.

   E). Failing to abate the Bloods, Crips, and Trinidadio gang's reign of terror on Rikers Island.

70. The acts and conduct of all named Defendants were acts and conduct under the color of state law as defined in 42 U.S.C. § 1983.

## Count One: BREACH OF DUTY TO PROTECT

71. Defendant No. 1 New York City under color of law intentionally, negligently, and with complete and deliberate indifference for plaintiff's rights, authorized, permitted, and tolerated the custom and practice of housing non-gang affiliated or "(Neutral)" inmates including the plaintiff in gang infested (SRG) housing units that have well documented histories of widespread violence against neutral inmates who are readily out-numbered and restrained from acting on their own in protecting their constitutional rights to be free from assault while under the care and custody of the NYC Dept. of Corrections in particular by Defendant's No. [2, 3, 4, and 5] by failing to:

    a). appoint promote, train, and supervise members of NYC DOC who would enforce the laws in effect in New York and would protect the constitutional rights of the inmates under the custody of New York

    b). require Defendants, DOC Commissioner Joseph Ponte to promulgate procedures and policies for the protection of non-gang affiliated inmates under the custody of DOC in the face of mounting gang related assaults and widespread gang violence in general at Rikers Island, that are consistent with the 4th, 8th, and 14th amendments to the U.S. Constitution:

    c). and by permitting the policy and custom of filling up empty bed space in (SRG) gang houses with neutral inmates without regard to their safety and well-being and allowing policies to exist that render neutral inmates more vulnerable to gang related violence as well as to be followed by subordinates.

72. Defendants Warden Duffy, Deputy Supt. Sheverigh, and Deputy Supt. Matos exercised deliberate indifference

73. to plaintiff's health and safety by failing protect him from a Jail attack by other inmates even though they were informed through, countless reports, disciplinary hearings, incident reports, and grievances that neutral inmates housed in 2-Main were being attacked by Crip rivals out side of the 2-Main housing unit. That a potential threat to plaintiff's health and safety existed but failed to establish reasonable measures to protect him from harm, when they had created the danger to plaintiff.

74. Defendants deliberate indifference to plaintiff's health and safety was further demonstrated when they allowed plaintiff to be escorted from 2-Main to intake with known Crip gang members then placed in crowded general population cells with Crip enemies while the actual Crip inmates were safely isolated from intermingling with other inmates, then allow plaintiff to return from Bronx supreme Court and be placed in the same predicament until plaintiff was attacked.

75. Defendants No [ 2, 4, and 5 ] ignored complaints and incidents of prior attacks on 2-Main inmates and failed to act on this information to prevent any further harm being done to the plaintiff and other neutral inmates housed in 2-Main.

76. Defendants failed to adopt reasonable policies and measures to insure that neutral inmates who requested to be transfered from the Crips house to a general population house were not being placed in grave danger as a result of their involuntary association with the Crips house in 2-Main.

77. The fact that Defendants [ 2, 4, and 5 ] determined that it was necessary to provide plaintiff security escorts whenever leaving the 2-Main housing area, In an effort to protect the plaintiff from the immanent danger they created and placed him in, is evidence of their recless disregard

for the safety and well-being of plaintiff.

78. Defendant No. 7 Correction Officer John Doe exercised deliberate indifference to plaintiff's health and well-being by failing to fulfill his legal duty to protect the plaintiff from attacks by other inmates when He allowed three inmates who had just attacked another to remain in a crowded intake cell with the plaintiff and other court return inmates instead of isolating them from the other inmates even though he witnessed them attacking the other inmate and broke it up.

79. Defendant No. 7 knew through training, incident reports, and job experience that violent and hostile inmates who are not immediately isolated from the general population following violent encounters with staff or other inmates are more likely to cause more harm, instead the Defendant left the three inmates in the cell with other inmates with little regard to the health and safety of the plaintiff and other inmates still in the crowded cell which gave them an opportunity to attack the plaintiff and cause the injuries described while the Defendant left to go summone Defendant No. 6 intake captain John Doe which contradicts DOC security protocols.

80. Defendant No. 8 Correction Officer Richard Roe exercised deliberate indifference to plaintiff's health and well-being by failing to provide adequate medical care to plaintiff following the attack after being informed of the incident and symtoms.

81. Defendant merely acknowledged to plaintiff that he could see that something happened to his face but instead of escorting plaintiff to the GMDC medical facility for treatment of his injuries, the Defendant escorted plaintiff back to the 2-main housing area and gave the plaintiff

false insurance that he would go back to intake and explain
to the captain the information plaintiff gave to him then
directed plaintiff to ask the 2-Main officer on duty to call
sick call to request a medical run escort.

82. As a result of the deliberate indifference exercised by
the aforementioned Defendants plaintiff suffered serious
harm at the hands of gang members rival to the Crips
gang. Plaintiff sustained injuries, including swelling and
bruises to his face and head. Plaintiff also suffered
extreme distress from the incident and suffered
further due to the lack of adequate medical remedy.

## Count Two: UNSAFE ENVIRONMENT

83. Defendants [2, 3, 4, and 5] exercised diliberate
indifference to plaintiff's health and safety by
establishing, implementing, and enforcing policies and
procedures that permits DOC personnel to place neutral
inmates including the plaintiff in hostile and dangerous
environments run by warring gang factions locked in
vigorous conflict with each other. particularly the Bloods
and Crips. then allow the plaintiff to remain living under
the constant threat of violence and be forced to
endure all of the (SRG) high security precaution
measures normally reserved for violent gang members
which include humiliating and constant strip searches
for weapons and other contraband as well as the occasional
distruction and damage of personal property.

84. As members of GMDC's administrative rulemaking, regulatory
and administering body Defendants [2, 3, 4, and 5] exercised
diliberate indifference to plaintiff's physical health and safety
by failing to protect the plaintiff from the dangerous
environment that Defendants policies created which was

negligent and blameworthy.

85. Defendants [2, 3, 4, and 5] exercised deliberate indifference to plaintiff's health and safety by failing to take notice through past incidents, disciplinary reports, grievances, direct observation, and job experience that placing the plaintiff in the "(Crips House)" in 2-Main would put him in an environment possing a substantial risk of harm in light of the hostile conflicts in progress on Rikers Island between the Bloods, Crips, and Trinidadio gang factions. That the possibility existed that plaintiff would be targeted by members of the Bloods and Trinidadios outside of 2-Main because of his involuntary association to the Crips, and if the plaintiff walked around the facility without an Officer escort the chance of plaintiff actually being assaulted by Bloods or Trinidadio gang members was substantially certain to occur.

86. Defendant No. 6 Intake Captain John Doe exercised deliberate indifference to plaintiff's health and well-being by creating and maintaining an unsafe environment at GMDC's intake area. As the administrative officer in charge of all intake related funtions Defendant failed to perform his legal obligation to protect the inmates under his custody by failing to exercise due care in running and managing the intake area at GMDC so as to avoid violence and unnecessary injury to inmates and facility staff members.

87. Defendant No.[6] Ignored and failed to act on mounting dada involving intake relalated violence contained in the intake log book, intake incident reports, disciplinary records, and complaints filed in lawsuits indicating that placing inmates in over crowded intake cells that are from area separate groups of the general population for long periods of time, not only obstructs the view of staff and prevents

the proper admistration of security and safety but actually provokes violent behavior and provides conenient conditions for it to materializ.

88. Defendant No.[6] faild to properly manage subordinates and adopt policies that promote safety and efficiency to govern and regulate the flow and movement of inmates to and from the GMDC intake area to avoid congestion, over croudedness, and hazardous conditions that put both inmates and staff at risk, specifically the dengerous conditions that increased plaintiffs' vulnerability to attack by other inmates out of the visible observation of Correctional staff, and no cameras to remotely monitor cell activity.

89. The aforementioned Defendants had a constitutional duty to protect the plaintiff from assault where they created the danger and maintained the hazardous conditions that exposed the plaintiff to grave danger by housing the plaintiff in a gang infested (SRG) Crip house then escorting him around the facility with known Crip members giving rival gang factions sufficient reason to suspect that plaintiff was also a member of the Crips and therefore a threat to their superiority and control over Rikers Island and by creating a dangerous and hazardous environment at GMDC's intake area that provides the most favorable conditions to stimulate and incite violent behavior and is the primary reason why a considerable amount of violent incidents take place in the intake area at GMDC.

90. As a result of the deliberate indifference exercised by the defendants, Plaintiff suffered serious harm at the hands of other inmates who are gang affiliated and hostle to any inmate living in 2-Main with Crips. Plaintiff sustained injuries including swelling and bruises to his face and head. Plaintiff also suffered extreme emotional distress from the incident.

Count Three: DEFICIENT MANAGEMENT OF
               SUBORDINATES

91. Failure of Defendant Municipality New York City and
Defendant DOC Commissioner Josph Ponte to
adequately train, supervise, discipline or in any other
way control the behavior and conduct of Defendants
No. [2, 4, 5, 6, 7 and 8] in the exercise of their
correctional functions, and their failure to enforce the
laws of the State of New York and the regulations
of New York City Department of Corrections is
evidence of deliberate indifference and reckless
lack of cautious regard for the safety and security
of the inmates under the custody and care of NYC
DOC including the plaintiff.

92. Defendant No. 2 Warden of GMDC John Duffy negligently
and with deliberate indifference to plaintiff's health and
safety caused the aforementioned injuries to plaintiff by
failing to properly train, supervise, Manage, and control
the conduct of Defendants No. [4, 5, 6, 7 and 8] and allowing
his subordinates to implement and enforce unconstitutional
policies that create unsafe environments for the inmates
under their care and renders them more vulnerable to
gang related violence and other foreseeable harm based
on past incidents, violent acts, tendencies and other
characteristics of gang activities in GMDC and 2-Main
particularly the policies that govern the administrative
functions of 2-Main that rendered the plaintiff more
vulnerable and exposed him to gang violence.

93. Defendants No. [4 and 5] as acting Deputy Superintendents
of security for GMDC Defendants negligently and with
deliberate indifference to plaintiff's health and well-being
caused the aforementioned injuries to plaintiff by

7 of 8

failing to properly train, supervise, and control the conduct of Defendants [6, 7, and 8] by allowing and condoning the activities of their subordinates in violating and depriving the constitutional rights of plaintiff protected by the 4th, 8th, and 14th amendments by allowing them to put the plaintiff's safety in jeopardy then failing to provide adequate medical remedy as well as failing to report acts of violence in violation of DOC policy.

94. Defendant Municipality as the employer of Defendants No. [2, 4, 5, 6, 7, and 8] and NYC Department of Corrections Commissioner Joseph Ponte is liable under the doctrine of respondeat superior for the tortious and unconstitutional conduct of the individual Defendants.

95. Defendant Joseph Ponte is the head of the New York City Department of Corrections and is responsible for the conditions under which all Correctional employees and inmates in NYC DOC are forced to meet and confer. The acts and conduct herein complained of were done with the knowledge, permission, consent, and participation of Joseph Ponte in that Joseph Ponte promulgates regulations and rules and directives governing the condition under which all Correctional Staff and inmates are permitted to meet and confer.

Plaintiff was a pretrial detainee at the time of incident under Book and Case Number : 241-12-09533

D.   Facts: _____ (See attached) _____

**What happened to you?**

_____
_____
_____

**Who did what?**

_____
_____
_____
_____

**Was anyone else involved?**

_____
_____
_____
_____

**Who else saw what happened?**

_____
_____
_____
_____

## III.   Injuries:

If you sustained injuries related to the events alleged above, describe them and state what medical treatment, if any, you required and received. _____

The Plaintiff sustained redness and swelling to his head and face tissue from the attack as well as emotional distress and was afraid to attend any beneficial programs or religious services to avoid any more contact with gang members who use these services to congregate

## IV.   Exhaustion of Administrative Remedies:

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Administrative remedies are also known as grievance procedures.

A.   Did your claim(s) arise while you were confined in a jail, prison, or other correctional facility?

Yes ✓   No ___   (see attached)

*Rev. 05/2010*                                            3

# IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

96. Plaintiff made grivences through 2-Mains counsel representative prior to the incident in GMDC intake along with other neutral inmates housed in 2-Main. Plaintiff gave sugestions to the inmate counsel on ways to reduce the risk of harm to the neutral inmates living with the Crips. Plaintiff sugested that all non-gang affiliated inmates living in 2-Main should be issued hallway passes like every other inmate in general population to prevent any misidentification associated with being escorted around the facility with known Crip gang members which gives the inmates in general population a Misleading assumption that all the inmates housed in 2-Main are Crip gang members because why else would they need an officer escort to travel around GMDC. Once you have been labled a Crip on Rikers Island, whether it be real or perceived the consequence are real dangerous and immediate. The inmate counsel which includes the Defendents [2, 4, and 5] and other GMDC officials and correctional staff, denied the Plaintiff's request to be issued hallway passes citing security concerns and safety issues.

97. Plaintiff filed a grivence to compel the GMDC administration to grant the plaintiff hallway passes a copy of which plaintiff filed with the couptroller office of New York in a personal injury claim on Feb 18, 2015 under Claim No. 2015PI009895. Unfortunately due to the deficiencies well known to the inmates in GMDC in the grivence system along with the lack of faith in it plaintiff did not receive any administrative response to his grivence and assumed his grivences were diliberately being ignored which contradics the DOC grivence policy.

98. Plaintiff filed another grievence immediately following the attack

1 of 2

on plaintiff that occured on 2/2/2015 at approx. 7:00 P.M.
at GMDC's intake area. Plaintiff again did not receive
any admistrative response.

99. Plaintiff did not file anymore grievances as he decided
that no further agency action at that point could
remove or lessen the injuries and harm already
suffered.

100. Plaintiff did not file a grievance to be transfered from
2-Main to a general population house because once
the plaintiff grasped the nature and seriousness of the
danger he faced outside of 2-Main he decided to
proceed along an alternative course of action because
to request a transfer from a "(Crips House)" to a
general population house would have been for lack
of words suicide. The Bloods who are the Crips number
one adversary have a well documented history of attacking
stabbing, cutting, and even killing suspected Crip geng
members on Rikers Island who were mistakenly placed
in a general population house that contained Blood
members. Plaintiff could not and would not willingly take
a chance like that with his life and safety with the
chaos going on at Rikers Island, between the Bloods
Crips, and Trinidadio gengs.

101. Plaintiff has no adequate remedy at law.

**V.     Relief:**

State what you want the Court to do for you and the amount of monetary compensation, if any, you are seeking, and the basis for such compensation. WHEREFORE, Chase Gullatt

**102.** prays for judgment in his favor and damages in his favor against all defendants in a amount sufficient to compensate him for the pain and mental anguish suffered by him due to the deliberate indifference, and intentional misconduct of defendants, but in no way less then $300,000, and such additional relief as the Court may deem just and proper.

**103.** award to plaintiff punitive damages in an amount to be determined at trial against all Defendants except Defendant Municipality.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 13 day of June , 20 16.

Signature of Plaintiff     *Chase Gullett*

Mailing Address     Five Points Corr. Facility Caller Box 119, RTE. 96 Romulus, NY. 14541

Telephone Number     Inmate No. 15A1962

Fax Number *(if you have one)*     N/A

**Note:**     All plaintiffs named in the caption of the complaint must date and sign the complaint. Prisoners must also provide their inmate numbers, present place of confinement, and address.

**For Prisoners:**

I declare under penalty of perjury that on this 19 day of July , 20 16, I am delivering this complaint to prison authorities to be mailed to the *Pro Se* Office of the United States District Court for the Southern District of New York.

Signature of Plaintiff:     *Chase Gullatt*

Inmate Number     Din No. 15A1962

FIVE POINTS CORRECTIONAL FACILITY
STATE ROUTE 96, P.O. BOX 119
ROMULUS, NEW YORK 14541

NAME: Chase Gullatt DIN: 15A1962 LOC: 8-

UNITED STATES DISTRICT COURT
Southern District of New York
Pro Se Office, Room 230
500 Pearl Street
New York, N.Y. 10007

USM
SDNY
2016 JUL 18

Five Points
Correctional Facility

neopost
07/18/2016
US POSTAGE $001.78⁰
FIRST-CLASS MAIL
ZIP 14541
041M11272007

OFFENDER CORRESPONDENCE PROGRAM
NAME: Chase Gullatt DIN: 15A1962

(Legal Mail)

(URGENT LEAGAL MAIL)

♻ Printed on Recycled Paper